IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ANDREW E. ZUPKO,

       Plaintiff,

v.                                        Civil Action No. **3:18CV493**

UNITED STATES OF AMERICA, *et al.*,

       Defendants.

## MEMORANDUM OPINION

Andrew E. Zupko, a former federal inmate proceeding *pro se* and *in forma pauperis*, filed this action seeking relief under *Bivens*[1] and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671, *et seq.* This action proceeds on Mr. Zupko's Particularized Complaint ("Complaint," ECF No. 41.)[2] This matter comes before the Court on the United States' Motion to Dismiss or in the Alternative for Summary Judgment, (ECF No. 43), and the individual Defendants DiCocco, Laybourn, Engel, Posey, and Chatman's Motion to Dismiss or in the Alternative for Summary Judgment.[3] (ECF No. 45). Defendants provided Mr. Zupko with the

---

[1] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[2] The Court employs the pagination assigned by the CM/ECF docketing system for citations to the parties' submissions. The Court corrects the capitalization, punctuation, and spelling in the quotations from the parties' submissions.

[3] The Individual Defendants work at the Federal Correctional Complex located in Petersburg, Virginia. Dr. M. DiCocco is the Clinical Director at FCC Petersburg. (Compl. 3.) A. Chatman is the Health Service Administrator. (*Id.*) Both are members of the Utilization Review Committee. (*Id.*) R. Engel is an Associate Warden at FCC Petersburg. (*Id.*) Dr. K. Laybourn is the Medical Administrator at FCC Petersburg. (*Id.*) J. Posey is a correctional officer at FCC Petersburg. (*Id.* at 7.) By Memorandum Opinion and Order entered on August 17, 2020, the Court dismissed all claims against A. Zayas because Mr. Zupko failed to serve A. Zayas in a timely manner. (ECF Nos. 64, 65.)

appropriate *Roseboro*[4] notice.  (ECF No. 43, at 1–2; ECF No. 45, at 1–2.)  Mr. Zupko responded.

(ECF No. 47.)  For the reasons stated below, Defendants' Motions for Summary Judgment will

be GRANTED.

## I.  Zupko's Claims

### A.  FTCA Claims

Mr. Zupko contends that he is entitled to relief under the FTCA on the following

grounds:

| | |
|---|---|
| Claim 1 | Bureau of Prison ("BOP") staff failed to provide him with "adequate and timely medical treatment." (Compl. 1.)  Specifically, he contends that: (a)  BOP personnel delayed for 62 days prior to completing the urgent MRI ordered by Dr. Prakash (*id.*); (b) BOP personnel delayed in promptly completing the MRI and returning Mr. Zupko to Dr. Prakash on May 5, 2017 so that Dr. Prakash could make further recommendations (*id.*); (c)  after the MRI was completed on April 17, 2019, BOP staff delayed again before sending the images to Dr. Kalluri, the surgeon, who eventually performed surgery on Mr. Zupko's back (*id.*); (d)  although on May 5, 2017, Dr. Parkash indicated that Zupko's need for surgery was "EMERGENT," the surgery was not performed until September 17, 2017 (*id.*); and, (e)  BOP personnel delayed treatment for 191 days from when Dr. Prakash first noted that Mr. Zupko's need from treatment was "URGENT" and when the surgery was eventually performed.  (*Id.*) |
| Claim 2 | BOP failed to properly treat Mr. Zupko's pain.  (*Id.*) |
| Claim 3 | BOP staff purposefully failed to schedule Zupko for appointments.  (*Id.*) |
| Claim 4 | BOP staff falsified Mr. Zupko's medical records by stating, on August 11, 2017 and November 17, 2017, that Zupko failed to appear for his medical appointments.  (*Id.* at 1, 3.) |
| Claim 5 | While Mr. Zupko was in the Special Housing Unit ("SHU"), BOP staff failed to provide Mr. Zupko with a bottom bunk and waited 24 hours prior to providing him with this medication.  (*Id.* at 1.) |

---

[4] Defendants filed, along with the Motions to Dismiss, notices consistent with the requirements set forth in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Civil Rule 7(K).

### B. Constitutional Claims

Mr. Zupko asserts that Defendants DiCocco, Laybourn, Engel, Posey, and Chatman

violated his rights under the Eighth Amendment.[5] Specifically, Mr. Zupko contends:

Claim 1    On May 16, 2017, Defendants DiCocco and Chatman disregarded Dr. Prakash's notation that Mr. Zupko's need for surgery was "EMERGENT" and urgent, and classified the need for surgery as "ELECTIVE" resulting in a prolonged delay in Mr. Zupko receiving surgery. (*Id.* at 3.)

Claim 2    Defendant Engel acted with deliberate indifference to Mr. Zupko's complaints that he was not receiving appropriate medical care. (*Id.* at 4.)

Claim 3    Defendant Laybourn failed to provide Mr. Zupko with adequate medical care:
  (a)    Defendant Laybourn failed to schedule Mr. Zupko with an appointment to address his chronic pain (*id.* at 5);
  (b)    Defendant Laybourn was indifferent to Mr. Zupko's need for "EMERGENT" back surgery (*id.* at 5–6); and,
  (c)    Defendant Laybourn falsified Mr. Zupko's medical records for August 9 through August 11, 2017 (*id.* at 6).

Claim 4    On February 16, 2017, Mr. Zupko was assigned to a cell in the SHU that only contained a top bunk. (*Id.* at 7.) Mr. Zupko repeatedly informed Defendant Posey that he needed a bottom bunk and medication. (*Id.*) Defendant Posey failed to take any action and Mr. Zupko fell while exiting the top bunk. (*Id.*)

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  The party seeking summary judgment bears the responsibility of informing the

Court of the basis for the motion and identifying the parts of the record which demonstrate the

absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

issue, a summary judgment motion may properly be made in reliance solely on the pleadings,

---

[5] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. AMEND. VIII.

depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)). In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere "*scintilla* of evidence" will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)).

In support of their Motion for Summary Judgment, Defendants DiCocco, Laybourn, Engel, Posey, and Chatman submitted the following evidence: Defendant Laybourn's first Declaration (Mem. Supp. Mot. Summ. J. Ex. 1 ("Laybourn Decl."), ECF No. 46–1), and copies of Mr. Zupko's medical records (*id.* Ex. 1, Attach. ("MR," ECF No. 46–2), and a second Declaration from Defendant Laybourn ("2nd Laybourn Decl.," ECF No. 63–1).[6] In response,

---

[6] The Court generally omits from the quotations and citations to Dr. Laybourn's Declaration any citation to the underlying medical records. The United States submitted the same records in support of its Motion for Summary Judgment. Additionally, the United States

Mr. Zupko submitted, among other things, his own sworn declaration (ECF No. 48–1), some of his medical records (ECF No. 48–2), a lengthy affidavit ("Zupko Aff.," ECF No. 48–5, at 3–18), and email exchanges between himself and Defendant Engel.  (ECF No. 59–1.)[7]

The facts offered by affidavit must be in the form of admissible evidence.  *See* Fed. R. Civ. P. 56(c).  In this regard, the statement in the affidavit or sworn statement "must be made on personal knowledge . . . and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Summary judgment affidavits must also "set out facts that would be admissible in evidence."  *Id.*  Thus, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990)).  In this regard, Mr. Zupko

---

submitted correspondence regarding whether Mr. Zupko had obtained expert certification for his claims of medical malpractice.

[7] Mr. Zupko has twice filed motions seeking leave to conduct discovery.  The Court denied the motions as unnecessary and advised Mr. Zupko that he does not require leave of court to conduct discovery.  Furthermore, although Mr. Zupko has filed a sworn declaration and a lengthy affidavit describing his ailment and course of treatment in opposition to the Motions for Summary Judgment, Mr. Zupko has not filed an affidavit that addresses the requirements of Federal Rule of Civil Procedure 56(d). *Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 250 (4th Cir. 2018) ("Rule 56(d) provides that a district court must defer ruling on a summary–judgment motion if the party opposing the motion 'shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" (quoting Fed. R. Civ. P. 56(d))).  Rule 56(d) "mandates that summary judgment be [postponed] when the nonmovant 'has not had the opportunity to discover information that is essential to his opposition.'" *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (quoting *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)).  Here, Mr. Zupko has had a reasonable opportunity to conduct discovery and has failed to identify any specific information he seeks by way of discovery that would create a genuine dispute of material fact.  *See Gordon v. CIGNA Corp.*, 890 F.3d 463, 478 (4th Cir. 2018) (concluding summary judgment not premature appropriate, despite the plaintiff's protestations to the contrary, where these two conditions were met).

cannot rely upon hearsay statements from non-defendants, such as Dr. Parkash, about Mr.

Zupko's medical condition.[8]

In light of the foregoing principles and submissions, the following facts are established

for the purposes of the Motion for Summary Judgment.  All permissible inferences are drawn in

favor of Mr. Zupko.

## II.  SUMMARY OF UNDISPUTED FACTS

### A.  How the BOP Prioritizes Medical Care

In her declaration, Dr. Laybourn, the Medical Director at FCC Petersburg, explains that:

> The BOP categorizes the [medical] care provided to inmates into the
> following five major levels of care:
>
> a. Medically Necessary - acute or emergent.  This level of care applies to medical
> conditions that are of an immediate, acute or emergent nature, which without care
> would cause rapid deterioration of the inmate's health, significant irreversible loss
> of function, or may be life-threatening.
>
> b. Medically Necessary - non-emergent.  This level of care applies to medical
> conditions that are not immediately life-threatening but which without care the
> inmate could not be maintained without significant risk of:
> ■ Serious deterioration leading to premature death
> ■ Significant reduction in the possibility of repair later without present
>   treatment
> ■ Significant pain or discomfort which impairs the inmate's participation in
>   activities of daily living
>
> Examples of conditions considered medically necessary, non-emergent include, but
> are not limited to:
>
> ■ Chronic conditions (diabetes, heart disease, bipolar disorder,
>   schizophrenia).
> ■ Infectious disorders in which treatment allows for a return to previous state
>   of health or improved quality of life (HIV, tuberculosis).
> ■ Cancer.

---

[8] For example, Mr. Zupko swears that, "Dr. Prakash verbally told me my injury is critical
and [had] been left untreated too long." (Zupko Aff. 7.)

c. Medically Acceptable – not always necessary. This level of care involves medical conditions that may be treated by elective medical procedures which may improve the inmate's quality of life.

d. Limited Medical Value – This level of care pertains to medical conditions in which treatment provides little or no medical value, are not likely to provide substantial long-term gain, or are expressly for the inmate's convenience.

e. Extraordinary – This level of care pertains to medical interventions that affect the life of another individual, such as organ transplantation, or are considered investigational in nature.

(Laybourn Decl. ¶ 4.)

To help review requests for outside medical, surgical, and dental procedures, the BOP requires that every institution establish a Utilization Review Committee. (*Id.*) "In accordance with BOP policy, FCC Petersburg has a standing Utilization Review Committee ('URC'), chaired by the Clinical Director." (*Id.*) "The purpose of the URC is to review matters concerning medical care before it, and make recommendations and decisions as to such matters." (*Id.*) "The URC may approve or deny such requests, refer the inmate for further evaluation, or take other appropriate action." (*Id.*)

"During 2017, Dr. DiCocco, the Clinical Director at FCC Petersburg, served as the Chair of the URC." (*Id.* ¶ 13.) Dr. Laybourn, and other staff, also served on the URC during 2017. (*Id.*)

### B. Medical Care Leading up to the MRI of Mr. Zupko on April 12, 2017

In January 2017, Zupko was incarcerated in FCC Petersburg. (*Id.* ¶ 6.) On January 24, 2017, Nurse Practitioner ("NP") Crossley saw Mr. Zupko for complaints of hip and back pain. (*Id.* ¶ 7.) NP Crossley was Mr. Zupko's primary care provider. (*Id.*) NP Crossley prescribed pain medication, ordered x-rays, and placed Mr. Zupko on a work restriction until January 31, 2017. (*Id.*) On January 25, 2017, x-rays of Mr. Zupko's hip were taken. (*Id.* ¶ 8.) On January 31, 2017, NP Crossley followed up with Zupko regarding his hip and back pain. (*Id.* ¶ 9.) Mr.

7

Zupko informed her it was hard to use the bathroom because of the pain when he pushed. (Zupko Aff. 1.) NP Crossley continued to prescribe the pain medication and continued the work restriction. (Laybourn Decl. ¶ 9.) She also requested an orthopedic consultation for Mr. Zupko with Dr. Prakash. (*Id.*)

The next day, on February 1, 2017, Mr. Zupko "woke up in excruciating pain" and with limited mobility. (Zupko Aff. 1.) The correctional officer overseeing Mr. Zupko's housing unit called the medical department. (*Id.*) After she got off the phone, the correctional officer informed Mr. Zupko that the medical department would not see him that day. (*Id.*)

On February 6, 2017, Mr. Zupko emailed Defendant Engel and expressed his frustration with the quality of medical care he was receiving. (Zupko Aff. 4; ECF No. 59–1, at 1.)

On February 7, 2017, FCC Petersburg medical staff again saw Mr. Zupko for complaints of back and hip pain. (Laybourn Decl. ¶ 10.) An examination "showed signs of an impingement/sciatica to Zupko's left side back area/upper leg." (*Id.*) Mr. Zupko was prescribed pain medication and discharged "back to his housing unit with temporary authorization to use a lower bunk until February 14, 2017. It was noted that Zupko was scheduled to see orthopedics." (*Id.*) The "lower bunk pass expired on February 14, 2017, and Mr. Zupko was not medically approved for a lower bunk pass for the remainder of that month." (*Id.* ¶ 54.) "Inmates requesting a lower bunk pass for medical reasons must seek the pass from medical staff. Correctional officers and other non-medical staff do not issue lower bunk passes for medical reasons and do not approve or dispense medications." (*Id.* ¶ 53.)

On February 8, 2017, Mr. Zupko emailed Defendant Engel a second time. (Zupko Aff. 4.) Two days later, on February 10, 2017, "Mr. Zupko was evaluated by Dr. Prakash, an outside orthopedist, for left hip pain." (Laybourn Decl. ¶ 11.) Dr. Prakash determined that Mr. Zupko had "a herniated nucleus pulposis ('HNP') with significant radiculopathy and weakness to

the left ankle. He recommended 25 mg Elavil (amitriptyline) at bedtime, and recommended an urgent MRI of Zupko's lumbar spine." (*Id.* ¶ 11.)[9]

On February 13, 2017, NP Crossley placed the amitriptyline order for Mr. Zupko and referred the "recommendation for an MRI to FCC Petersburg's URC committee for its consideration and approval." (*Id.* ¶ 12.) Defendant Laybourn cosigned NP Crossley's note to the URC. (*Id.*)

The following day, "[o]n February 14, 2017, the URC approved the MRI request, and stamped the Consultation Request form as 'Urgent Time Sensitive.' Such stamp is used as a means of giving notice to staff responsible for scheduling inmate medical appointments that the appointment should be scheduled expeditiously." (*Id.* ¶ 14 (internal citation omitted).)

On February 16, 2017, Mr. Zupko was placed in the SHU after he became involved in a verbal altercation with NP Crossley. (Zupko Aff. 5.) Specifically, Mr. Zupko "confronted Ms. Crossley asking why she denied" his prescription for ibuprofen. (*Id.*) NP Crossley told Mr. Zupko that he could purchase the ibuprofen from the commissary. (*Id.*) Before he was placed in the SHU, Mr. Zupko sent another email to Defendant Engel expressing the difficulty he was having with NP Crossley. (*Id.*)

Defendant Posey oversaw the housing unit in the SHU where Mr. Zupko was confined. (*Id.*) Mr. Zupko informed Defendant Posey "at least a half dozen times" that he needed a bottom bunk and to see medical. (*Id.*) Mr. Zupko did not receive a bottom bunk or his prescribed medication, Elavil 25 mg. (*Id.*) Thereafter, Mr. Zupko fell from the top bunk, causing extreme pain. (*Id.*)

---

[9] Dr. Prakash made a notation in Mr. Zupko's medical record that he "probably would need surgery." (Zupko Aff. 5.)

"On the evening of February 17, 2017, staff responded to a report of a medical emergency in SHU where Plaintiff was found on his cell room floor complaining of lower back pain and right foot numbness. During a medical examination that same evening, Plaintiff informed medical staff that he was on his way to the shower and felt something pop in his back." (Laybourn Aff. ¶ 15.) Mr. Zupko was prescribed a refill of ibuprofen for seven days. (*Id.*) Mr. Zupko was then returned to the same cell with the top bunk for the next two weeks. (Zupko Aff. 5.)

On February 24, 2017, medical staff conducted a follow up visit with Mr. Zupko in the SHU. (Laybourn Aff. ¶ 16.) Mr. Zupko was determined to have lower back pain and was prescribed thirty days of Duloxetine medication. (*Id.*)

On March 1, 2017, the BOP staff conducted a hearing on the charges that had led to Mr. Zupko's placement in the SHU. (Zupko Decl. 6.) The disciplinary hearing officer concluded that Mr. Zupko "didn't commit any [sic] of the act that Ms. Crossley had" leveled against him. (*Id.*)

On March 4, 2017, Mr. Zupko again emailed Defendant Engel and expressed his dissatisfaction with NP Crossley and asked to be switched to a different Mid-Level Practitioner ("MLP"). (*Id.*) Defendant Engel responded that "'no changes will be made.'" (*Id.*)

"On March 20, 2017, medical staff renewed Mr. Zupko's medication orders for Duloxetine (30 day supply), Ibuprofen (7 days), and Prednisone (12 days)." (Laybourn Decl. ¶ 17.)

On March 28, 2017, Mr. Zupko went to the medical department unannounced and prompted MLP Negron to order lab tests, which were a necessary precursor to the outstanding MRI. (Zupko Aff. 6.) Mr. Zupko contends that NP Crossley should have ordered these tests, but failed to do so. (*Id.*)

10

"On March 30, 2017, Mr. Zupko was seen by NP Crossley for complaints of continued pain in his lower back. She assessed Mr. Zupko and noted he was awaiting an MRI. She ordered Acetaminophnen/Codeine (5-day supply), Amitriptyline (90 days), Duloxetine (60 days), and Ibuprofen (7 days) . . . for low back pain." (Laybourn Decl. ¶ 19.) Dr. Laybourn cosigned NP Crossley's note. (*Id.*) NP Crossley also gave Mr. Zupko a lower bunk authorization until September 29, 2017. (*Id.*) During this visit, Mr. Zupko informed medical staff that the pain he was experiencing was 10 on a scale of 1 to 10. (Zupko Aff. 7.)

On March 30, 2017, lab testing, as a precursor to Mr. Zupko's MRI, occurred. (Laybourn Aff. ¶ 20.) The lab results were provided to the BOP the following day. (*Id.*)

Two weeks later, "[o]n April 13, 2017, Mr. Zupko's MRI was completed." (Laybourn Decl. ¶ 22.) The MRI took place two months after his February 17, 2017 appointment with Dr. Prakash.

### C. Medical Care between April 13, 2017 MRI and May 16, 2017 URC Meeting

Zupko received additional medical care from FCC Petersburg staff between April 13, 2017 and May 16, 2017, when the URC designated his surgery request as routine.

First, on April 17, 2017, NP Crossley ordered additional pain medication for Mr. Zupko. (*Id.* ¶ 23.) Dr. Laybourn cosigned Crossley's note. (*Id.*) On April 19, 2019, Dr. Laybourn ordered "a 5-day supply of Acetaminophen/Codeine 300/30 ('Tylenol 3') for Mr. Zupko." (*Id.* ¶ 24.) On April 18, 2017, Mr. Zupko sent an email to Dr. Laybourn inquiring as to why she had not seen him yet. (Zupko Aff. 7.) On April 26, 2017, Dr. Laybourn responded to Mr. Zupko that "'Non-Emergent medical concerns can be addressed best in sick call.'" (*Id.*)

One week later, on April 24, 2017, Mr. Zupko was brought to the medical department on a stretcher after his leg gave out causing him to fall. (*Id.*) MLP Zayas assessed Mr. Zupko for complaints of back pain. (Laybourn Decl. ¶ 25.) "MLP Zayas noted that Mr. Zupko's MRI

11

showed a herniated disc at the lumbosacral joint, also called, L5-S1. . . . Mr. Zupko was prescribed a Ketorolac injection for pain, along with Acetaminophen/Codeine 300/30 mg (5 days)." (*Id.*) Dr. Laybourn cosigned the medical note. (*Id.*)

The next day, "[o]n April 25, 2017, Mr. Zupko was seen by MLP Negron for back pain. MLP Negron ordered Acetaminophen/Codeine (30 day supply), Amitriptyline (90 days), and Duloxetine (180 days), for low back pain." (*Id.* ¶ 26.) Dr. Laybourn cosigned the note. (*Id.*)

"On April 28, 2017, MLP Negron requested a follow-up orthopedic consult by Dr. Prakash to evaluate the result of Mr. Zupko's MRI. The level of care for the consult request was designated 'Medically Necessary – Non-Emergent.'" (*Id.* ¶ 27 (internal citation omitted).)

"On May 5, 2017, Dr. Prakash reviewed Mr. Zupko's MRI results, assessed Mr. Zupko with S1 radiculopathy with left leg weakness." (*Id.* ¶ 28.) He recommended an "L5S1 discectomy emergent because of L[eft] ankle weakness." (MR 218.) That same day, "NP Crossley referred Dr. Prakash's recommendation for surgery to the URC for its consideration." (Laybourn Decl. ¶ 29.)[10]

On May 8, 2017, Zupko wrote to Dr. Laybourn inquiring when the recommended surgery would occur. (*Id.* ¶ 30.) Also, on May 8, 2017, Mr. Zupko sent an inmate request to NP Crossley concerning his pain medication. (Zupko Aff. 7.) On May 11, 2017, she wrote back and told him to go to the pill line twice per day. (*Id.*) "On May 11, 2017, NP Crossley [also] ordered [Mr. Zupko] a 30–day supply of Oxcarbazepine for low back pain." (Laybourn Decl. ¶ 31.)

---

[10] According to Mr. Zupko, Dr. Prakash told him that his "injury is critical and [had] been left untreated too long. He specifically told [Mr. Zupko] he's going to tell Dr. Laybourn to get [Mr. Zupko] scheduled within a few days. . . . Dr. Prakash further added [Mr. Zupko] can get permanent damage if left untreated any longer." (Zupko Aff. 7.) Dr. Prakash, however, did not include this information in the consultation notes sent to the BOP. (MR 218.)

### D. URC Approves Surgery on May 16, 2017 But Designates the Priority as Routine

"On May 16, 2017, Dr. DiCocco, Chair of the URC, approved Mr. Zupko to undergo L5S1 discectomy surgery with 'routine priority.'" (*Id.* ¶ 32.) The designation of the routine priority permitted the surgery to "be scheduled in the normal course." (2nd Laybourn Decl. ¶ 3.) Dr. Laybourn explains that the URC marked the need for surgery as routine priority (non-emergent) "because Zupko's need for surgery at that time was not emergent–i.e., was not of a nature which without care would cause rapid deterioration of the inmate's health, [or] significant irreversible loss of function . . . ." (Laybourn Decl. ¶ 50.)[11]

The URC takes the inmate's entire medical record into consideration when assessing the priority of the medical need. (2nd Laybourn Decl. ¶ 3.) "This is a case-by-case determination for each individual patient and is balanced with the outside medical needs of other inmates within the institution and staff resources available." (*Id.*) As previously noted, under the relevant BOP program statement, "procedures deemed 'emergent' are generally those that would cause such a rapid deterioration in the health of the patient as to require immediate intervention." (*Id.* ¶ 4.)

> Dr. Laybourn swears:
>
> The URC prioritizes procedures to ensure that inmates with immediate grave health concerns receive the allocation of staff resources first. This specific determination is not made solely based upon the designation of an outside physician; thus, even if a consulting physician deems something "emergent," "urgent," or potentially "routine," that does not mandate how the BOP and the URC must categorize the procedure.

---

[11] Mr. Zupko alleges that, "according to the BOP Program '6031.34,' it clearly noted that if the clinical director does not follow the recommendation of a consultant, the clinical director will document his justification in the inmate's health record. However nowhere in my medical records does it indicate such a memo." (Zupko Aff. 8.) Mr. Zupko did not include a copy of BOP Program Statement 6031.34 in his submissions and the Court's research did not reveal such a statement. BOP Program Statement 6031.04 deals with inmate health care. Section 34 of that Program Statement, however, addresses "STANDARD PROCEDURES FOR DETERMINING ALCOHOL INTOXICATION." https://www.bop.gov/policy/progstat/6031_004.pdf (last visited October 5, 2020).

At the time of the review by the URC in May 2017, BOP medical records reflect that [Zupko] presented as ambulatory, without use of a wheelchair, and able to perform his activities of daily living without difficulty. He presented with complaints of pain and occasional weakness in his left leg. There was no evidence of bowel or urinary dysfunction. In the absence of any factors, like those listed above, the URC determined that this inmate's herniated disc and associated pain was considered "routine," therefore would be scheduled at the next available date as determined by the surgeon and scheduler.

As documented in his BOP medical record, [Mr. Zupko's] complaints of pain appeared to be the most concerning symptom with which he presented during his course of treatment for his herniated disc. Medical conditions such as a herniated disc and its associated symptoms of pain, exist on a continuum, in which the severity of a patient's presenting symptoms may wax and wane. Generally, a patient's symptoms or complaints of pain are not what primarily determines the urgency of a surgical procedure. It should also be noted that Mr. Zupko was often non-compliant with his pain management.

Even though Mr. Zupko's procedure was prioritized by the URC as "routine," it was scheduled as quickly as possible after May 2017 when the MRI was reviewed by the outside orthopedist, Dr. Prakash.

(*Id.* ¶¶ 4–7 (paragraph numbers omitted).)

E. **Medical Care after May 16, 2017 and Before the September 19, 2017 Surgery**

On May 24, 2017, Mr. Zupko sent an email to Defendant Engel "concerning [his] pain, and triage forms [he had] been submitting, but [] wasn't being seen. [Mr. Zupko] also informed him what the specialist recommended." (Zupko Aff. 8.) On June 1, 2017, Defendant Engel informed Mr. Zupko that he could get his medical records in three weeks. (*Id.*)

"On May 25, 2017, Mr. Zupko was evaluated by MLP Kirby for complaints of pain." (Laybourn Decl. ¶ 33.) Mr. Zupko told MLP Kirby he wanted his Elavil dosage reduced so it would be easier to get up for 6 a.m. pill call, but he did not want to change the prescription for Tylenol 3 because that was the only medication "that took the edge off for a few hours." (Zupko Aff. 8.) Mr. Zupko "was noted to walk easily to the exam room. He was noted to have been non-compliant with Tylenol #3 medication, and to be pending an outside consult. He was assessed with low back pain and prescribed Meloxicam, Oxcarbazepine, and Baclofen for low

14

back pain." (Laybourn Decl. ¶ 33.) Mr. Zupko "felt this visit was a waste of [his] time." (Zupko Aff. 8.)

On that same day, Dr. Laybourn informed Mr. Zupko that he did not know when his surgery would be scheduled and that he would have to wait for an available date. (Laybourn Decl. ¶ 34.) Dr. Laybourn "also informed him of the need to take his prescribed medications consistently." (*Id.*)

After this visit, Mr. Zupko sent multiple triage forms requesting to be seen by NP Crossley, but she refused to see him. (Zupko Aff. 9.)

On May 28, 2017, Mr. Zupko sent another email to Defendant Engel regarding his pain and the recommended surgery. (*Id.*) Defendant Engel responded that Mr. Zupko needed to wait for his surgery to be scheduled and to "contact him by the end of July if [his] surgery ha[d] not been completed." (*Id.*)

On June 6, 2017, Mr. Zupko submitted a form asking to be seen. (*Id.*) Instead of scheduling Mr. Zupko for an appointment, NP Crossley responded by stating "'medication renewal has been requested.'" (*Id.*)

On June 8, 2017, Mr. Zupko sent another email to Defendant Engel. (*Id.*) Defendant Engel, however, did not respond. (*Id.*)

On June 19, 2017, Mr. Zupko walked up to the Medical Department without an appointment because NP Crossley refused to schedule him for an appointment. (*Id.*) Mr. Zupko was not seen because he did not have an appointment. (*Id.*)

On June 20, 2017, Mr. Zupko sent another email to Defendant Engel complaining that he had submitted four triage forms in the last 30 days, but had not been seen in the Medical Department. (*Id.* at 10.) On June 28, 2017, Defendant Engel responded and stated that he had spoken directly to NP "Crossley and [he] said some mumbo jumbo about medication being

approved for 60 days . . . ." (*Id.*) On June 26, 2017, NP Crossley had ordered a 60–day supply of Amitriptyline (Elavil) medication for Mr. Zupko for his lower back pain. (Laybourn Decl. ¶ 35.)

On June 21, 2017, Mr. Zupko sent Defendant Engel an email inquiring as to why the surgery the outside specialist that had marked as "Emergent" had not been performed. (Zupko Aff. 10.) On June 27, 2017, Defendant Engel informed Mr. Zupko that the medical staff at FCC Petersburg have the final say on prioritizing medical procedures. (*Id.*)

On June 22, 2017, Mr. Zupko was informed by Ms. Brown in the medical department that his MRI had only been sent to the surgeon, Dr. Kalluri, two days prior—on June 20, 2017. (*Id.*)

On June 29, 2017, Mr. Zupko sent a "cop out" to Dr. Laybourn explaining that he needed to see her because his pain "is unbearable" and he wanted information about his surgery. (*Id.*)

On July 1, 2017, Mr. Zupko submitted another triage form wherein he stated he was experiencing new pain on his right side. (*Id.* at 11.)

MLP Negron saw Mr. Zupko on July 7, 2017 for complaints of back pain. (Laybourn Decl. ¶ 36.) Mr. Zupko informed MLP Negron of the new pain he has been experiencing on his right side. (Zupko Aff. 11.) Mr. Zupko also informed MLP Negron of the frustration he had been experiencing with NP Crossley because she had been ignoring his complaints. (*Id.*) Mr. Zupko asked about the status of his surgery. (*Id.*) MLP Negron informed him that it was pending, "[m]eaning it hasn't been scheduled yet." (*Id.*) Mr. Zupko was prescribed a 30–day supply of Oxycarazepine and Baclofen for pain. (Laybourn Decl. ¶ 36.) MLP Negron requested approval from the URC for a follow-up orthopedic consultation for Mr. Zupko. (*Id.*) The request was marked routine priority. (*Id.*) Dr. DiCocco cosigned MLP Negron's note. (*Id.*)

16

On July 23, 2017, Mr. Zupko sent another email to Defendant Engel complaining about his pain and the fact that the surgery had not occurred. (Zupko Aff. 12.) Defendant Engel did not respond. (*Id.*)

On August 1, 2017, Mr. Zupko submitted a triage form explaining that he wanted to discuss his pain medication. (*Id.*) Mr. Zupko also wrote a "cop out" to Defendant DiCocco asking why his surgery had been marked routine and explained that "Dr. Prakash told me I need surgery soon to prevent any kind of further damage. Dr. DiCocco didn't respond back." (*Id.*)

On August 9, 2017, Mr. Zupko approached Dr. Laybourn outside of the Health Services Unit and raised concerns about his medications and reported that he had difficulty walking. (Laybourn Decl. ¶ 37.) Dr. Laybourn told Mr. Zupko that he had been not compliant in taking his medication "and that he was pending an appointment with the surgeon (Dr. Kalluri) for his herniated disc." (*Id.*) Dr. Laybourn "noted that the surgery was considered elective (non-emergent) in nature." (*Id.*) Dr. Laybourn further noted in Mr. Zupko's medical records that Mr. Zupko appeared to ambulate "without significant difficulties or discomfort." (*Id.*; MR 30.)[12]

"On August 10, 2017, NP Crossley ordered medication refills for Baclofen (180 days) and Oxcarbazepine (180) days for back pain, and a note was made indicating Mr. Zupko was to be seen by medical staff on August 11, 2017." (Laybourn Decl. ¶ 38.) Mr. Zupko did not appear for the August 11, 2017 appointment. (*Id.* ¶ 39.) Mr. Zupko indicates this information is false because he was not scheduled to be seen on August 11, 2017. (Zupko Aff. 14–15.)

On August 14, 2017, roughly three months after the URC designated Mr. Zupko's surgery as "routine" at its May 16, 2017 meeting, Dr. Kalluri, the orthopedic surgeon who was to

---

[12] Mr. Zupko contends that the insertion of this remark in his medical records was "a malicious and deliberate decision to alter my medical records to reflect that I didn't need help and was not in pain . . . ." (Zupko Aff. 13.)

perform Mr. Zupko's surgery, assessed Mr. Zupko. (Laybourn Decl. ¶ 40.)  On that date, Dr.

Kalluri noted that "the surgery should be done expeditiously to maximize neurologic recovery at

this point."  (*Id.*)

Two days later, on August 16, 2017, after reviewing Dr. Kalluri's note, Dr. Laybourn

made a consultation request to approve Mr. Zupko for surgery.  (*Id.* ¶ 41.)  Dr. Laybourn marked

the request for surgery "as medically necessary 'Acute or Emergent," and the scheduled target

date for the surgery was listed as September 15, 2017."  (*Id.*)  Dr. Laybourn's determination

> to designate Mr. Zupko's surgery as "medically necessary- acute or emergent" was
> based on [Zupko's] then-current condition and clinical evaluation by Dr. Kalluri
> who reevaluated this inmate on August 14, 2017.  Dr Kalluri, who would be the
> surgeon performing the procedure, acknowledged changes in Mr. Zupko's
> condition which [Dr. Laybourn] reviewed, as well as upon [Dr. Laybourn's] own
> review of Mr. Zupko's condition and medical records.

(2nd Laybourn Decl. ¶ 8.)

On August 15, 2017, Mr. Zupko learned that Associate Warden Engel had been replaced

by Associate Warden Bolster. (Zupko Aff. 13.) On August 16, 2017, Mr. Zupko submitted another

triage form so that he could be seen by NP Crossley.  (*Id.*)

"On August 22, 2017, Dr. DiCocco approved the request for surgery, with urgent priority,

and noted the surgery was already scheduled." (Laybourn Decl. ¶ 42.)  On August 29, 2017, Mr.

Zupko informed "NP Crossley that the only medications that help alleviate his back pain are

Meloxicam and Naproxen.  He requested that he be prescribed those drugs for pain.  NP renewed

his Meloxicam prescription and discontinued [the] other medications that Mr. Zupko had been

taking."  (*Id.* ¶ 43.)

On August 30, 2017, NP Crossley scheduled Mr. Zupko for a preoperative evaluation,

which included the drawing of blood and lab tests on that blood.  (Zupko Aff. 14.)

On September 19, 2017, Mr. Zupko underwent the recommended surgery, roughly seven months after his initial February 10, 2017 consult with Dr. Prakash. (Laybourn Decl. ¶ 45.) "In the operative report, the surgeon noted that the surgery was indicated, given the failure of 'conservative treatments including activity modification, physical therapy and medical management of pain' and Mr. Zupko's consent." (*Id.* ¶ 45.)[13]

### F. Medical Care after September 19, 2017

On September 20, 2017, Dr. Laybourn discussed Mr. Zupko's case with Dr. Kalluri. (*Id.* ¶ 46.) "FCC Petersburg medical staff noted Mr. Zupko's return from surgery, ordered 3 days of Oxycodone/Acetaminophen and 10 days of Docusate Sodium capsule, and requested the orthopedist to conduct a follow-up evaluation." (*Id.*) "On September 22, 2017, NP Crossley conducted a post-operative evaluation of Mr. Zupko, during which Mr. Zupko complained of lower back pain." (*Id.* ¶ 47.) NP Crossley examined Mr. Zupko and prescribed 3 days of Acetaminophn/Codeine tablets." (*Id.*)

On October 11, 2017, Mr. Zupko had a follow up visit with Dr. Prakash. (Zupko Aff. 14.) Mr. Zupko told Dr. Prakash that he still has tingling and numbness in both "thighs and a knot behind [his] left buttock/down [his] leg." (*Id.*) Additionally, Mr. Zupko indicated that on a scale of one to ten his pain had decreased from a maximum of ten to around a six or seven. (*Id.*) Dr. Prakash told Mr. Zupko he would see him in three months regardless of whether his condition improved. (*Id.*)

On October 25, 2017, the new Associate Warden stopped using triage forms and instead allowed inmates to report to sick call four times a week. (*Id.*) On October 27, 2017, Mr. Zupko

---

[13] Defendants, however, fail to direct the Court to an instance where Mr. Zupko had been provided physical therapy.

reported to sick call and told NP Crossley about his "stinging pain." (*Id.*) She told Mr. Zupko "to come back in two weeks if symptom[s] don't change." (*Id.*)

Roughly three weeks later, on November 16, 2017, Mr. Zupko returned to sick call because his symptoms had not changed. (*Id.*) Mr. Zupko was told that he would "be placed on a call out very shortly to be seen." (*Id.*) On November 17, 2017, NP Crossley stated that Mr. Zupko was a no show for his appointment, which Mr. Zupko insists was false. (*Id.* at 14–15.) On December 12, 2017, Mr. Zupko emailed Associate Warden Bolster about NP Crossley's allegedly false statement in his medical records that he was a no show. (*Id.* at 15.)

On January 20, 2018, Mr. Zupko had a consultation with Dr. Prakash. (*Id.* at 15.) Dr. Prakash requested a MRI, routine priority. (*Id.*) On January 31, 2018, Mr. Zupko met with a BOP investigator about his allegations that NP Crossley had falsified his medical records. (*Id.*)

On February 13, 2018, the URC approved Mr. Zupko for another MRI. (*Id.*) On March 28, 2018, the MRI truck arrived at institution. (*Id.*) Mr. Zupko's MRI was not performed because NP Crossley had failed to schedule the necessary precursor lab tests. (*Id.*)

On May 31, 2018, Mr Zupko's "second MRI was conducted." (*Id.* at 16.)

On June 4, 2018, NP Crossley transferred to a different BOP institution. (*Id.*)

On September 26, 2018, Mr. Zupko received an epidural steroid injection that temporarily relieved his pain for about three days. (*Id.*)

On October 23, 2018, Mr. Zupko met with MLP Negron regarding his continuing pain. (*Id.*) MLP Negron submitted a consultation request for Mr. Zupko to be seen by Dr. Kalluri. (*Id.*) The URC approved the request about a week later. (*Id.*) At some point thereafter, FCC Petersburg terminated its relationship with Dr. Prakash and Dr. Kalluri. (*Id.*)

On June 19, 2019, Mr. Zupko was examined by Dr. Kim at OrthoVirginia. (*Id.* at 17.) Dr. Kim took additional x-rays and examined Mr. Zupko's MRIs. (*Id.*) Mr. Zupko explained the

previous delay in conducting his surgery. (*Id.*) Mr. Zupko asked Dr. Kim if he could "get permanent damage due to [his] disc pressing on [his] nerve for so long. His response was 'Absolutely.'" (*Id.*) Dr. Kim noted in Mr. Zupko's medical records that "'pain is likely due to nerve damage.'" (*Id.*) Dr. Kim did not recommend additional surgery and remarked that Mr. Zupko would likely deal with pain for the rest of his life. (*Id.*) Dr. Kim "recommended a TENS Unit for pain relief." (*Id.*)

## IV. FTCA Claims

With respect to medical malpractice tort claims against the government, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Federal Deposit Ins. Co. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA is one such waiver, allowing suit "only with respect to a certain category of claims," *Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2009) (internal quotations omitted), including "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment," 28 U.S.C. § 1346(b). "The scope of this waiver is limited by . . . specific exceptions." *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005).

Relevant here, jurisdiction exists only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Therefore, "the substantive law of the state where the tort occurred determines the liability of the United States." *Raplee v. United States*, 842 F.3d 328, 331 (4th Cir. 2016); *see also Meyer*, 510 U.S. at 478 ("§ 1346(b)'s reference to the 'law of the place' means law of the State."). Because Mr. Zupko's medical care occurred in Virginia, Virginia law provides "the source of substantive liability under the FTCA." *Meyer*, 510 U.S. at 478.

21

A. **Medical Malpractice—FTCA Claims 1, 2, 3, and 5**

Mr. Zupko's complaints contained in FTCA Claims 1, 2, 3 and 5 about the delay or the denial of adequate medical care are subject to dismissal because he failed to obtain the required expert certification that Virginia law requires prior to initiating this lawsuit.

The Virginia Medical Malpractice Act ("VMMA") requires that, prior to serving the defendant, a party alleging medical malpractice must obtain an expert certification of merit indicating that the defendant "deviated from the applicable standard of care and the deviation was a proximate cause of the injuries claimed." Va. Code Ann. § 8.01–20.1; *see also Dunn v. United States Dep't of Veterans Affairs*, No. 3:18CV699, 2020 WL 4720044, at *8 (E.D. Va. Aug. 13, 2020) ("The VMMA requires that by the time a plaintiff requests service of process on the defendant, the plaintiff have obtained written certification from a medical expert stating that the defendant deviated from the applicable standard of care and the deviation was a proximate cause of the injuries claimed.").[14] Virginia defines malpractice as follows: "'Malpractice' *means*

---

[14] Specifically, Va. Code Ann. § 8.01–20.1 states as follows:

> Every motion for judgment, counter claim, or third party claim in a medical malpractice action, at the time the plaintiff requests service of process upon a defendant . . . shall be deemed a certification that the plaintiff has obtained from an expert witness . . . a written opinion signed by the expert witness that, based upon a reasonable understanding of the facts, the defendant . . . deviated from the applicable standard of care and the deviation was a proximate cause of the injuries claimed. . . .
>
> . . . .
>
> Upon written request of any defendant, the plaintiff shall, within 10 business days after receipt of such request, provide the defendant with a certification form that affirms that the plaintiff had obtained the necessary certifying expert opinion at the time service was requested or affirms that the plaintiff did not need to obtain a certifying expert witness opinion. If the plaintiff did not obtain a necessary certifying expert opinion at the time the plaintiff requested service of process on a defendant as required under this section, the court shall impose sanctions . . . and may dismiss the case with prejudice.

*Id.*

*any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered,* or which should have been rendered, by a health care provider, to a patient." Va. Code Ann. § 8.01–581.1 (emphasis added).

If a plaintiff fails to obtain a necessary certifying expert opinion at the time the plaintiff requested service, "the court shall impose sanctions . . . and may dismiss the case with prejudice." Va. Code Ann. § 8.01–20.1; *see Parker v. United States*, 475 F. Supp. 2d 594, 596–97 (E.D. Va. 2007) (citations omitted); *Dunn*, No. 3:18cv699, 2020 WL 4720044, at *10 (dismissing case for failure to comply with the VMMA). The VMMA provides a limited exception to the certification requirement where expert certification is excused "if the plaintiff, in good faith, alleges a medical malpractice action that asserts a theory of liability where expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." Va. Code Ann. § 8.01–20.1. This exception "applies only in 'rare instances' because only rarely do the alleged acts of medical negligence fall within the range of a jury's or factfinder's common knowledge and experience." *Parker*, 475 F. Supp. 2d at 597 (footnotes omitted) (quoting *Beverly Enter.-Va., Inc. v. Nichols*, 441 S.E.2d 1, 3 (Va. 1994)); *see Keitz v. Unnamed Sponsors of Cocaine Research Study*, 510 F. App'x 254, 255–56 (4th Cir. 2013); *James v. United States*, 143 F. Supp. 3d 392, 396 (E.D. Va. 2015) ("The exception to the certificate of merit requirement applies only in rare circumstances, such as when a foreign object is left in a patient's body." (citing *Easterling v. Walton*, 156 S.E.2d 787, 790–91 (Va. 1967))).

Here, in response to the United States' request for expert certification, (ECF No. 44–3), Mr. Zupko states that he did not obtain the required expert certification. (ECF No. 44–4.) Mr. Zupko "asserts part of his FTCA claim need not [obtain expert certification] because the basis of the claim is not that BOP physicians failed to provide adequate medical treatment, rather,

23

Plaintiff contends BOP employees failed to schedule him in a timely and necessary fashion as required by his medical condition." (ECF No. 48, at 8.) Mr. Zupko contends that his claim is one of negligence, rather than medical malpractice, and does not require expert certification. (*Id.* (citing *Krembel v. United States*, No. 5:16–CT–3018–F, 2017 WL 1058179, at *3 (E.D.N.C. Mar. 20, 2017); *Daniel v. United States*, No. 5:11–CT–3067–BO, 2013 WL 393337, at *2 (E.D.N.C. Jan. 31, 2013)).

      *Daniel* and *Krembel*, two of the cases on which Zupko relies, do not rise to an exception from dismissal under the law. In *Daniel*, a FTCA case from North Carolina, the plaintiff alleged that a delay in medical care constituted negligence on the part of BOP staff. The plaintiff claimed

> he ha[d] been diagnosed with Macular Degeneration. The Bureau of Prison[s] staff at the Federal Correctional Complex at Butner, North Carolina, ha[d] continually failed to facilitate treatment for his condition and his eye sight continue[d] to deteriorate. Plaintiff specifically allege[d] that a delay in receiving "intravitreal Lucentis injections" and other medical care including follow-up medical visit to his medical doctor constitute[d] negligence on the part of BOP staff.

*Daniel*, 2013 WL 393337, at *1 (citations omitted). The United States sought to dismiss plaintiff's FTCA claim arguing

> that North Carolina imposes substantive legal requirements that a person must follow to pursue a medical malpractice claim which plaintiff has failed to do. *See* N.C.R. Civ. P. 9(j).
>     Under North Carolina Rule of Civil Procedure 9(j), a plaintiff's medical malpractice complaint must assert that the medical care has been reviewed by a person who is reasonably expected to qualify (or whom the plaintiff will move to qualify) as an expert witness and who is willing to testify that the medical care received by the plaintiff did not comply with the applicable standard of care.

*Id.* at *1–2. The *Daniels* Court rejected that argument noting, "plaintiff's complaint does not appear to allege a claim for medical malpractice, but that prison officials failed to provide him with timely and necessary medical care as required by his medical condition. Thus, as stated in

plaintiff's response and as understood by this court, plaintiff asserts ordinary negligence." *Id.* at \*2.

> In *Krembel*, another FTCA case from North Carolina, the district court concluded that:

> Although this action involves Plaintiff's medical treatment, ultimately, this case sounds in ordinary negligence, not medical malpractice. Simply put, Plaintiff's claim is not that BOP physicians failed to provide adequate medical treatment. Rather, Plaintiff contends that BOP employees failed to timely schedule a surgery that had already been approved, and that the resulting delay caused his cancer to spread.

*Krembel*, 2017 WL 1058179, at \*3 (citations omitted).  In reaching that conclusion, the Court noted that "North Carolina recognizes claims of ordinary negligence which bear some connection to medical treatment." *Id.* (citing *Allen v. Cnty. of Granville*, 691 S.E.2d 124, 126–27 (N.C. Ct. App. 2010); *Estate of Waters v. Jarman*, 547 S.E.2d 142, 145 (N.C. 2001); *cf. Littlepaige v. United States*, 528 F. App'x 289, 294 (4th Cir. 2013)).

The courts in Virginia, however, have not allowed plaintiffs to avoid the VMMA certification requirement by suggesting their health care claims or delay of medical care claims sound in ordinary negligence rather than malpractice. *See Marshall v. United States*, No. 1:18cv19 (AJT/TCB), 2019 WL 1293342, at \*6 (E.D. Va. Mar. 20, 2019) (Trenga, J.) (citations omitted) ("The timetable upon which physicians schedule care, as well as their reasons for making scheduling decisions, are matters of professional medical judgment."); *Bond v United States*, No. 1:08cv324 (JCC/TRJ), 2008 WL 4774004, at \*3 (E.D. Va. Oct. 27, 2008) (citation omitted) (holding that a claim that BOP officers failed to retrieve plaintiff from his cell in time for an orthopedic appointment and thereby caused a two-month delay in his treatment required VMMA certification because plaintiff would have to show that "failure to provide him with an orthopedic examination for his finger within two months deviated from the applicable standard of care, and that the delay caused permanent damage," issues clearly outside "'the range of the

jury's common knowledge and experience'"); *Rundle v. Carter*, No. CL 14–9423, 2015 WL 12591842, at *3 (Va. Cir. Ct. 2015) ("Given that a jury is unlikely to be equipped with the knowledge necessary to determine whether Defendants' failure to schedule Plaintiff's surgery according to her wishes . . . compl[ies] with or deviate[s] from the applicable standard of care, the Court finds that expert certification was necessary.").

Mr. Zupko's complaints in FTCA Claims 1, 2, 3 and 5 about the delay or denial of adequate medical care are subject to dismissal because Zupko failed to obtain the required expert certification.[15] *See Marshall*, 2019 WL 1293342, at *5 (citation omitted) ("A physician's decision to prescribe or recommend certain courses of treatment for a patient's pain is a question of professional medical judgment, and an expert certification is therefore required to challenge it."). Accordingly, Defendants are entitled to summary judgment on FTCA Claims 1, 2, 3, and 5.

## B. Alleged Falsification of Medical Records—FTCA Claim 4

In Claim 4, Mr. Zupko contends that BOP personnel entered false information in his medical records. The United States has not waived sovereign immunity for such a claim. "The FTCA does not apply to '[a]ny claim arising out . . . misrepresentation [or] deceit.'" *Gifford v. Rathman*, No. 1:14–CV–1179–SLB–JEO, 2017 WL 4340454, at *15 (N.D. Ala. Sept. 29, 2017) (alteration in original) (quoting 28 U.S.C. § 2680(h)), *aff'd*, 788 F. App'x 245 (4th Cir. 2019). Therefore, claims that government officials placed false information in an individual's medical records are not covered by the FTCA's waiver of sovereign immunity. *Id.*; *accord White v. United States*, No. 94–2366, 1995 WL 473979, at *2 (4th Cir. Aug. 11, 1995); *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1012 (7th Cir. 1991) (citations omitted) ("The FTCA

---

[15] The alleged denial of a lower bunk constitutes a medical decision because the record establishes that only medical personnel may issue lower bunk passes. Furthermore, the records fail to demonstrate that any of the acts of medical negligence fall within the range of a jury's or factfinder's common knowledge and experience.

exceptions for misrepresentation and deceit certainly encompass [plaintiff's] claim that VA officials conspired to distort his medical records and misrepresent the law."). Accordingly, Defendants are entitled to summary judgment on FTCA Claim 4.

### V. Constitutional Claims

The Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "To that end, a prison official's deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal quotation marks and citation omitted).

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff must demonstrate: (1) that *objectively* the deprivation suffered or harm inflicted was "'sufficiently serious,' and (2) that *subjectively* the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)) (emphasis added). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008) (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

The subjective prong of an Eighth Amendment claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very

high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.

*Farmer*, 511 U.S. at 837.

*Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### A. The Decision to Treat Mr. Zupko's Recommended Surgery as Routine Priority Does Not Establish Deliberate Indifference—Constitutional Claims 1 and 3(b)

Mr. Zupko fails to direct the Court to evidence that his condition at the time of the May 16, 2017 URC meeting was such that Defendants' designation of his surgery as "routine" exposed him to substantial risk of serious harm.

Mr. Zupko contends that Defendants DiCocco, Chatman, and Laybourn acted with deliberate indifference when they classified his need for surgery as routine, rather than emergent as recommended by Dr. Prakash.[16] Dr. Laybourn explained that the URC marked the need for surgery as routine priority (non-emergent) "because Zupko's need for surgery at that time was not emergent–i.e., was not of a nature which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or life-threatening." (Laybourn Decl. ¶ 50.) The record reflects that:

> [C]omplaints of pain appeared to be the most concerning symptom with which he presented during his course of treatment for his herniated disc. Medical conditions such as a herniated disc and its associated symptoms of pain, exist on a continuum, in which the severity of a patient's presenting symptoms may wax and wane. Generally, a patient's symptoms or complaints of pain are not what primarily determines the urgency of a surgical procedure.

(2nd Laybourn Decl. ¶ 6.) For his complaints of pain, Defendants DiCocco, Chatman, and Laybourn knew that Mr. Zupko had been provided with a variety of pain medications. These Defendants further knew that in the window before the surgery was scheduled, Mr. Zupko would have regular access to medical personnel to adjust those medications to help alleviate any pain. *See Walkers v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (observing that when considering a claim of deliberate indifference the court must also consider the totality of medical care

---

[16] In Claim 1 and 3(b), Mr. Zupko faults Defendants DiCocco, Chatman, and Laybourn for their role in classifying his need for surgery as routine on May 16, 2017. The Court liberally construes Claim 3(b) to also allege that after May 16, 2017, Dr. Laybourn acted with deliberate indifference by failing to expedite Mr. Zupko's surgery.

provided, rather than simply the particular treatment the inmate was not provided) (citing *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999)). Further, designating a surgery as routine does not reflect apathy as to the need for surgery, but instead results in the scheduling of the surgery "at the next available date as determined by the surgeon and scheduler." (2nd Laybourn Decl. ¶ 5.)

Moreover, courts within the jurisdiction of the United States Court of Appeals for the Fourth Circuit have observed that limited "delays for routine medical care [are] not deliberate indifference '[b]ecause the BOP has tens of thousands of inmates in its care and limited resources, it is not unreasonable for the BOP to prioritize inmate injuries and the care that they receive.'" *Marshall v. United States*, No. 1:18cv19 (AJT/TCB), 2019 WL 1293342, at *9 (E.D. Va. Mar. 20, 2019) (second alteration in original) (quoting *Morrell v. United States*, No. 5:05CV171, 2007 WL 1097871, at *4 (N.D.W. Va. Apr. 12, 2007). Given the information available to these Defendants, the record indicates that they acted reasonably in designating Mr. Zupko's surgery as routine. *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001) (observing that "officials who act reasonably in response to a known risk," fail to act with deliberate indifference). Mr. Zupko fails to demonstrate that by initially designating his surgery as routine, Defendants DiCocco, Chatman, and Laybourn "subjectively recognized a substantial risk of harm. . . . [and] that [they] subjectively recognized that [their] actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee*, 372 F.3d at, 303 (quoting *Rich*, 129 F.3d at 340 n.2).

In Claim 3(b), Mr. Zupko contends that Dr. Laybourn also acted with deliberate indifference by not expediting Mr. Zupko's surgery after May 16, 2017. As explained above, Dr. Laybourn's initial decision to classify the surgery as routine priority did not demonstrate deliberate indifference. Mr. Zupko fails to direct the Court to any new information provided to Dr. Laybourn in the weeks following that decision that should have alerted Dr. Laybourn to the

30

fact that the then–current schedule for the surgery posed a substantial risk of serious harm to Mr. Zupko's person.

Moreover, when Dr. Laybourn received new information about Mr. Zupko's condition in August of 2017, she promptly made efforts to accelerate the surgery. In July of 2017, Mr. Zupko began to experience new pain on his right side and was approved for an orthopedic consultation. (Laybourn Decl. ¶ 36.) On August 14, 2017, Dr. Kalluri, the orthopedic surgeon who was to perform Mr. Zupko's surgery, assessed Mr. Zupko and noted that "the surgery should be done expeditiously to maximize neurologic recovery at this point." (*Id.* ¶ 40.) Two days later, on August 16, 2017, after reviewing Dr. Kalluri's note, Dr. Laybourn sent a consultation request to approve Mr. Zupko for surgery. (*Id.* ¶ 41.) Dr. Laybourn marked the request for surgery "as medically necessary 'Acute or Emergent,'" and the scheduled target date for the surgery was listed as September 15, 2017. (*Id.*) The surgery occurred on September 19, 2017. The above facts fail to support an inference that Dr. Laybourn acted with deliberate indifference to Mr. Zupko's need for surgery after May 16, 2017. *See Brown*, 240 F.3d at 389. Accordingly, Defendants are entitled to summary judgment on Constitutional Claims 1 and 3(b).

### B.  Defendant Engel Did Not Act With Indifference—Constitutional Claim 2

The record does not reflect that Engel acted with indifference. In contrast, Associate Warden Engel investigated Mr. Zupko's complaints and received assurances that Mr. Zupko was receiving appropriate care.

This record demonstrates that Warden Engel constitutes a non-medical prison official. Case law has long established that:

> If a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison

31

official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

In Claim 2, Mr. Zupko alleges that Associate Warden Engel acted with deliberate indifference to the inadequate medical care provided to Mr. Zupko. Mr. Zupko points to emails that he sent to Engel regarding his medical care. For example, on February 7, 2017, Mr. Zupko emailed Engel complaining, *inter alia*, that he was in pain and "medical doesn't know what is wrong with me." (ECF No. 59–1, at 1.) Six days later, on February 13, 2017, Engel responded: "I spoke to Health Services and you were just seen by the Orthopedic Consultant on Friday, February 10th. Narcotics were not indicated based on this visit. Ms Crossley will be addressing the recommendations by the consultant for an MRI at the next Utilization Review Meeting." (*Id.* at 2.)

On or about May 28, 2017, Mr. Zupko sent Engel another email complaining about his back pain, the change in his medications, and the failure to schedule his surgery expeditiously. (ECF No. 59–1, at 11.) On May 30, 2017, Engel responded:

> I spoke to Health Services Staff and verified your surgery with the Orthopedic Consultant was approved by the URC on May 16th. You now need to simply wait for your surgery to be scheduled. You will not be provided advance notice of the surgery based on security reasons, but I would tell you to follow-up with me at the end of July 2017 via another e-mail if the procedure has not been completed.

(*Id.*)

On June 20, 2017, Mr. Zupko sent Engel an email complaining about the medications he was and was not receiving and about NP Crossley's failure to see him. (*Id.* at 16.) On June 28, 2017, Engel responded:

> I spoke to your primary care provider (Ms. Crossley) and was provided the following information. Your prescription for Baclofen was approved only for 60

days and a request to renew this non-formulary medication has been submitted. You were previously assessed by Mr. Kirby and informed about the importance of taking your medications as prescribed, otherwise the requests for non-formulary medications will be likely be denied.

(*Id.* at 16.)

On June 21, 2017, Mr. Zupko sent Engel another email inquiring, among other things, as to why the approved surgery had not been performed. (*Id.* at 15.) On June 27, 2017, Engel responded, "[t]he short answer to your question is that the Health Services staff at FCC Petersburg staff are responsible for prioritizing the scheduling of all medical procedures. Outside consultants make recommendations which are part of the final decision making process." (*Id.*)

Here, Associate Warden Engel knew that Mr. Zupko was under the consistent care of multiple medical experts. When Mr. Zupko raised complaints about the quality of care that he was receiving, Engel did not turn a deaf ear to Mr. Zupko's complaints. Instead, he investigated those complaints and delivered assurances about the propriety of Mr. Zupko's medical care. *See Gordon v. Schilling*, 937 F.3d 348, 358 (4th Cir. 2019) (observing that "a nonmedical prison official can generally defer to the decisions of prison medical personnel at the institutional level"). Under these circumstances, Mr. Zupko fails to demonstrate that Associate Warden Engel acted with deliberate indifference. Accordingly, Warden Engel is entitled to summary judgment on this claim.

### C. Defendant Laybourn Did Not Act With Indifference—Constitutional Claims 3(a) and 3(c)

In Claim 3(a), Mr. Zupko fails to demonstrate that Dr. Laybourn acted with deliberate indifference when she addressed Mr. Zupko's chronic pain.

The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

"It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain." *Id.* So long as medical staff respond reasonably to an inmate's complaints of pain, the inmate's Eighth Amendment rights are not violated. *See Brown*, 240 F.3d at 389–90. Because the reasonableness of any such response usually calls for a medical judgment, "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes*, 95 F.3d at 592. This is not such an extreme circumstance. *See, e.g., Martinez v. Mancusi*, 443 F.2d 921, 924–25 (2d Cir. 1971) (reversing dismissal when prison doctor forced prisoner plaintiff, without hospital ordered pain medication, to walk out of hospital and stand for meals after plaintiff had leg surgery for which hospital specialist had ordered plaintiff to lie flat and not to walk).

Upon his initial complaints of pain, Mr. Zupko was promptly seen in the medical department and prescribed pain medication. When his pain continued, he was approved to see outside specialists and eventually scheduled for surgery. While his surgery was pending and in the wake of his surgery, medical staff provided Mr. Zupko with a host of medications and adjusted those medications in an effort to reduce his discomfort. *See Wilson v. Adams*, 901 F.3d 816, 821–22 (7th Cir. 2018) (affirming grant of summary judgment on claim of deliberate indifference where "totality" of care showed proper attention to inmate's pain). In short, Mr. Zupko fails to demonstrate that Dr. Laybourn acted with deliberate indifference to his pain. Accordingly, Dr. Laybourn is entitled to summary judgment on Claim 3(a).

Next, in Claim 3(c), Mr. Zupko contends that Dr. Laybourn subjected him to cruel and unusual punishment by falsely stating in his medical records that, on August 9, 2017, Mr. Zupko was "'observed leaving Health Services ambulating with no significant difficulties or

34

discomfort.'" (Compl. 6.)  Mr. Zupko fails to demonstrate that this statement was false, much less that it was made with deliberate indifference on the part of Dr. Laybourn.  Accordingly, Dr. Laybourn is entitled to summary judgment on Claim 3(c).

### D.  Defendant Posey Did Not Act With Indifference—Constitutional Claim 4

Mr. Zupko fails to demonstrate that Defendant Posey acted with deliberated indifference by failing to provide Mr. Zupko with a bottom bunk.

On February 16, 2017, Mr. Zupko was placed in the SHU after he became involved in a verbal altercation with NP Crossley.  (Zupko Aff. 5.)  Defendant Posey was in charge the housing unit in the SHU where Mr. Zupko was confined.  (*Id.*)  Mr. Zupko informed Defendant Posey a half dozen times that he needed a bottom bunk and to see medical.  (*Id.*)  Mr. Zupko did not receive a bottom bunk or his prescribed medication, Elavil 25 mg.  (*Id.*)  Later, Mr. Zupko fell from the top bunk, causing extreme pain.  (*Id.*)

Mr. Zupko fails to demonstrate that Defendant Posey acted with deliberate indifference by failing to provide Mr. Zupko with a bottom bunk.  The record reflects that, at FCC Petersburg, only the medical staff can issue a bottom bunk pass.  Mr. Zupko's bottom bunk pass had expired on February 14, 2017.  When he arrived in the SHU on February 16, 2017, directly from the Medical Department, Mr. Zupko had not been issued a bottom bunk pass, thus indicating that Mr. Zupko did not have a medical need for a bottom bunk.  Although Mr. Zupko made unadorned, verbal demands for a bottom bunk, the record does not demonstrate that Mr. Zupko's physical condition was such that it alerted Defendant Posey that Mr. Zupko had a medical need for a bottom bunk or that the failure to promptly provide a bottom bunk posed a substantial risk of serious harm to Mr. Zupko's person.  Accordingly, that aspect of Claim 4 fails.

In his Complaint, Mr. Zupko also faults Defendant Posey for failing to provide him with his medication on February 16, 2017.  However, in his affidavit, Mr. Zupko does not indicate

that he asked Defendant Posey for his medication, much less that Defendant Posey was subjectively aware that the failure to provide him 25 milligrams of Elavil would pose a substantial risk of serious harm to Mr. Zupko's person. *Iko*, 535 F.3d at 241 (emphasizing that "actual knowledge of the risk of harm to the inmate is required" (citing *Young v. City of Mt. Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001))). Accordingly, Defendant Posey is entitled to summary judgment on Claim 4.

## V.  CONCLUSION

Defendants' Motions for Summary Judgment (ECF Nos. 43, 45) will be GRANTED. Mr. Zupko's claims will be DISMISSED. The action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

_____
M. Hannah Lauck /s/
United States District Judge

Date: 10 - 14 - 20
Richmond, Virginia